## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### CASE NO. 16-CR-20854-MARTINEZ/GOODMAN

UNITED STATES OF AMERICA

v.

WOCAYDREEN ELDARIUS MORROW,

    Defendant.

_____/

### REPORT AND RECOMMENDATIONS ON MOTION TO SUPPRESS

A federal grand jury indicted Defendant Wocaydreen Eldarius Morrow ("Morrow") on one count, alleging possession with intent to distribute controlled substances. Morrow filed a motion to suppress evidence [ECF No. 10], which the United States opposes [ECF No. 16].

United States District Judge Jose E. Martinez referred the motion [ECF No. 11] and I held an evidentiary hearing and required post-hearing supplemental memoranda, which were submitted and reviewed [ECF Nos. 17; 18; 24; 25].[1]

---

[1]     The Undersigned recognizes that counsel prepared comprehensive memoranda after the hearing in a relatively short amount of time. They obviously worked hard and put in a substantial effort, including working late in the evening. For example, the memoranda were filed less than an hour before midnight last night. The Undersigned hopes that the attorneys' clients appreciate their dedication and focused commitment. I certainly do.

The suppression motion focuses on police surveillance of Morrow for approximately half an hour before he entered a small grocery store in a high crime area of Miami, Morrow's reaction in the store when he spotted a police officer, Morrow's decision to throw a drug-filled brown paper bag atop a freezer, the officer's subsequent stop (or arrest, depending on whose interpretation of the facts is adopted) of Morrow and a statement from a store person suggesting that Morrow is a drug dealer.

With four exceptions (which will be explained later), there is no dispute over the material facts. Instead, the legal wrangling arises from competing versions of the legal consequences arising from this mostly-unchallenged factual scenario.

For example, the United States contends that Morrow abandoned the bag and therefore lacks standing to challenge its seizure and subsequent search, while Morrow argues that he was merely trying to protect the bag from police inspection, an activity he says is different than abandonment (and one which preserves his ability to challenge law enforcement activity concerning the bag). The parties are also tussling over the characterization of the initial in-store encounter: Morrow says it was a full-fledged arrest, while the United States argues it was a permissible *Terry* stop. Based on this legal split, the parties are embroiled in another legal battle: the United States say the officers had reasonable suspicion to make the *Terry* stop, and Morrow says the officers lacked probable cause for what he brands as an arrest.

2

For the reasons outlined in greater detail below, the Undersigned respectfully recommends that the District Court **deny** the motion.

## Factual Background[2]

Local police immediately arrested Morrow on July 30, 2016, after the narcotics were found in the bag, and the Miami-Dade State Attorney's Office filed an information against him. He remained in local custody and the State of Florida pursued state criminal charges against him.  The two witnesses who testified at the suppression hearing before me had previously provided deposition testimony to Morrow's criminal defense attorney in the state case. A federal grand jury indicted him on November 4, 2016. He was then taken into federal custody, where he is detained. The state criminal charges are still pending.

Two witnesses testified at the hearing. For administrative convenience, I will outline the relevant testimony on a witness-by-witness basis, as the testimony was provided.

The relevant testimony is as follows:

### Sgt. Brandon Lanier

Sgt. Brandon Lanier is a Miami Police Department officer who works in the vice and narcotics division. He spent four years on patrol in the Overtown and Allapatah

---

[2]     The factual section is based on the hearing transcript, which has been prepared and uploaded on CM/ECF. [ECF No. 21].

neighborhoods of Miami, working both in the gang unit and as a beat officer. When he was a beat officer, some people in those neighborhoods knew him by name.

Lanier is familiar with a "hand-to-hand" transaction. He is also familiar with loitering-type behavior. At times, he would simply walk up to a suspect and start speaking with him. Although he did not know Morrow by name, Lanier had seen Morrow a few times before he saw him on the night of July 30, 2016. Lanier recalls seeing Morrow once before in Allapatah and once or twice in Overtown. He said he had enough of a background with Morrow to have a cordial conversation with him.

On the night of July 30, 2016, Lanier was conducting surveillance for narcotics and prostitution activity. He was in plain clothes and was driving an undercover, unmarked vehicle.

Lanier saw Morrow loitering in front of the ABC food market at 163 N.W. 14th Street. No trespassing signs were posted on both sides of the entrance. Officers had not received complaints about trespassing or loitering, though. Officer Stanley Paul-Noel had a better, more-extended view, however. Paul-Noel advised Lanier and other officers (through their police radios) that he saw a suspect speaking with people as they were coming in and out of the store.

Lanier is familiar with the store. He and other officers have previously investigated violent crimes and drug activity at the store. He knows of prior undercover narcotics purchases at the store but does not know how many and does not know how

many arrests were made at the store from April 2015 through April 2016. He was advised that Morrow was not buying anything in the store, was not using the pay phone and was hanging around the front of the store for approximately twenty minutes.

Lanier testified that he had not received information that Morrow was involved in suspected drug dealing, but (as noted below, in the discussion of the testimony from the second witness) another officer testified that he *did* advise Lanier (and other officers on the radio frequency they were using) that he suspected narcotics activity. But Lanier testified that he was advised that Morrow was acting suspiciously -- by loitering, not buying anything and making contact with people coming in and out of the store.

Lanier testified that his squad had engaged in more than 75 drug buys during the previous year, but he could not pinpoint how many were at the ABC grocery store.

Lanier decided to make contact with Morrow on foot to learn his identity and obtain information about why he was at the store. He asked the other officers to stand by so that he could leave his vehicle, get out, and approach Morrow. After he was out on the street, Lanier advised the officers to move in and he casually walked up to the store. As he approached the poorly-lit corridor which served as the store's entrance, Lanier saw Morrow inside of the store, standing next to an ATM machine, between that machine and the coolers.

According to Lanier, he did not then know that another officer had seen Morrow engage in suspected hand-to-hand transactions[3] in the corridor in front of the store. He said he gave the order that other officers converge to help in identifying Morrow. In addition, Lanier said that other officers had not advised him, over the police radio, that Morrow was suspected by officers of being involved in drug transactions in front of the store. Instead, he said he was advised that Morrow was spotted in "suspicious" behavior.

Lanier was wearing his police badge around his neck.  He made eye contact with Morrow, who then turned his body to the side, reached to his left side, grabbed a brown bag from his side and tossed it on top of a shelf above the coolers. Lanier pretended as though he did not see the bag being thrown.

Lanier said he could not at that time have blocked Morrow's path to leave, and he explained that the store also had a back door.

Lanier said he asked Morrow what he was doing. They spoke for a short while. Lanier mentioned to Morrow that they had not seen each other for a while. He asked Morrow why he was in the store, given that he was merely hanging around and not buying anything. According to Lanier, he asked Morrow for permission to pat him down.  Morrow gave him permission. Morrow was not handcuffed at the time and Lanier did not then tell him that he was under arrest. Lanier did not find any weapons

---

[3]     These transactions often involve a suspect hanging around a suspicious location and making contact with people.

or drugs on Morrow. Morrow told him some things which he construed as an effort to deflect the conversation toward a different topic.

In his state court deposition, Lanier did not mention having a conversation with Morrow in the store. Lanier explained that this was because no one asked him the question.

Lanier said the only time he touched Lanier was when he patted him down.

Lanier then told Morrow that he was being detained because Lanier needed to recover what Morrow had thrown on top of the cooler. Several other officers arrived and Lanier moved Morrow a few freezer doors down, where he detained Morrow. Someone in the store retrieved a ladder and Lanier used it to retrieve the brown paper bag. The bag was the only item on the shelf above the freezer. Lanier described the shelf as dusty.

Lanier saw suspected narcotics in the bag and advised other officers to handcuff Morrow and advise him that he was under arrest.

Lanier did not ask Morrow if the bag belonged to him.  He said he did not ask this question because he had just seen Morrow throw the bag on the shelf.

Another customer approached Paul-Noel and solicited him to sell some narcotics. There was a conversation and an exchange of money, and the other customer was arrested.

At one point in his testimony, Lanier said that the officers came into the store "about a minute" after he entered [ECF No. 21, p. 73], but, at another point, he testified that they arrived "seconds" after he arrived. [ECF No. 21, p. 57].

**Officer (now Detective) Stanley Paul-Noel**

Paul Noel has been a City of Miami police officer for five years. He became a robbery detective approximately two months ago (i.e., after Morrow was arrested in connection with this case). Before his assignment to the robbery squad, Paul-Noel was on the problem solving team and spent time in Overtown. He has seen hundreds of hand-to-hand transactions.

On July 30, 2016, he was in an unmarked silver Ford F-150. He set up surveillance on the front of the ABC grocery store because he saw a man (later determined to be Morrow) hanging out in the doorway, making contact with other people in front of the store and in the alcove entrance.

He conducted surveillance for approximately half an hour and saw Morrow make contact with 4 separate individuals. One of those individuals went into the store, Morrow quickly followed and then the other person walked quickly away. He also saw Morrow and another person enter the store together and move to the left. The clerk was to the right. The officer then saw the other person leave the store.

Paul-Noel saw Morrow meet the other three persons in the hallway/alcove (also called a vestibule) but he could not see an actual hand-to-hand transaction. However, it

8

appeared to be a hand-to-hand transaction, but he could not see money or drugs being exchanged. He said he advised the other officers of a suspect **possibly selling narcotics** in front of the ABC grocery store. At that point, Lanier said he would approach the suspect on foot.

The four persons with whom Morrow made contact (only one of whom he saw actually go into the store, as opposed to moving into the entrance corridor), were wearing dingy, old clothes. The other persons with whom Morrow made contact in the vestibule area did not have a bag or other item with them to suggest that they had made a purchase at the grocery store.

By the time Paul-Noel entered the store, he saw Lanier with his hand on Morrow's shoulder, and on his arm, directing him to sit down. Morrow was then on the floor, sitting down. Lanier had been in the store for approximately **10 to 15 seconds** before Paul-Noel entered the room. [ECF No. 21, p. 96].

Lanier told him "wait here," and Lanier went to retrieve the bag with the ladder provided by a store employee.

Another person entered the store and asked to buy drugs. Morrow was behind him at the time. The other person handed Paul-Noel money for the narcotics, but then said, "You know what, I don't know you that well, I want to buy drugs from **him**" (pointing at Morrow). The record is not completely clear about *when* the other customer pointed to Morrow as a drug dealer. However, in context, it seems that it happened

several minutes **after** Lanier had initially and briefly detained Morrow and after Lanier had found the drugs in the bag retrieved from atop the freezers. I reach this conclusion because Lanier testified that the encounter with the other customer happened "about ten minutes" after Morrow was in police custody.

Morrow did not testify at the hearing.

In any event, there are four factual issues which are fuzzy and which the parties dispute. I have resolved the dispute with the following findings:

1.      Did Paul-Noel advise the other officers, including Lanier, on the police radio that he suspected Morrow was involved in drug sales activity or did he merely mention suspicious behavior concerning the loitering and contact with others in the vestibule? I find that Paul-Noel has a better, more-comprehensive memory of the events and I therefore credit his testimony. Therefore, I find that he *did* mention his specific suspicions about drug sales.

2.      Did Lanier touch Morrow other than during the consensual pat-down? Lanier said he did not, but Paul-Noel testified that he saw Lanier with his hands on Morrow's shoulder and arm when he walked in. In my view, I find that Paul-Noel has a better, more-comprehensive recollection of the events and I credit his testimony on this point.  Therefore, I find that Lanier *did* place his hand on Morrow's body to temporarily and briefly detain him.

3.      For how long was Lanier in the store with Morrow before other officers arrived? At one point, Lanier said "about a minute." At another point, he said "seconds." And Paul-Noel said 10 to 15 seconds. These are all estimates, of course. There was not testimony establishing that the officers had stop watches with them at the time or that they monitored their own watches to note the precise amount of time which elapsed between Lanier's initial entry into the store and the time the other officers followed. For purposes of this Report and Recommendations, I will use a 15-second interval.

4.      Did Lanier speak to Morrow briefly before obtaining his consent for a pat-down?  Morrow's post-hearing memorandum contends that he did not, arguing that "Lanier could not have possibly engaged Mr. Morrow in pleasantries, sought permission to pat him down, and completed a pat down" in the 10 to 15 seconds it took other officers to enter the store behind him. Morrow also questions Lanier's recollection because he did not mention in his deposition anything about a conversation with Morrow. As noted above, though, Lanier said he was not asked about it during the deposition. Given the lack of actual evidence (as opposed to attorney argument) from Morrow and the fact that Lanier could have had a very brief, 7 or 8-second exchange with Morrow before the pat-down and before the other officers entered 15 seconds later, I credit his testimony in general on this point. Nevertheless, I also find that the

exchange was limited but was sufficient for Lanier to conclude that Morrow was being evasive.

## Applicable Legal Principles and Analysis

The Undersigned must resolve the following questions in connection with the suppression motion:

1.    Was the brief in-store detention of Morrow (before Lanier retrieved the bag from atop the freezer) a *Terry* stop or a full-fledged arrest?

2.    If it was a *Terry* stop, then did police have reasonable suspicion, and if it was an arrest, then did they have probable cause?

3.    When assessing the evidence which Lanier had when he detained Morrow in the store, does the Court consider all the evidence collectively known to all police officers that evening or only the information passed on to Lanier?

4.    May the Court consider the comment from the other suspect (that he preferred to buy his drugs from Morrow because he knew him) in assessing either reasonable suspicion or probable cause?

5.    Did Morrow abandon the bag, thereby destroying any standing he might have to challenge the seizure and search of the bag?

Morrow seeks to suppress the narcotics found inside of the bag which Lanier found on top of the freezer. If Morrow abandoned the bag, though, then he has no

standing to challenge the seizure and search of the bag. Therefore, the Undersigned will discuss that issue first.

**Standing (did Morrow abandon the bag?)**

A district court's finding regarding abandonment usually involves the resolution of factual disputes, so those abandonment determinations are ordinarily reviewed for clear error. *United States v. Ramos,* 12 F.3d 1019, 1022 (11th Cir. 1994).

A defendant charged with a crime of possession may claim the benefits of an exclusionary rule only if *his* Fourth Amendment rights have in fact been violated. *United States v. Salvucci,* 448 U.S. 83, 85 (1980). Moreover, search and seizure of abandoned property does not violate the Fourth Amendment. *Abel v. United States,* 362 U.S. 217, 241 (1980).

A defendant bears the burden of demonstrating standing by showing that he had a reasonable expectation of privacy in the searched item. *Rakas v. Illinois,* 439 U.S. 128, 143 (1979). An individual who abandons or denies ownership of personal property may not contest the constitutionality of its subsequent acquisition by police. *Ramos*, 12 F.3d at 1203; *United States v. Cofield,* 272 F.3d 1303, 1306 (11th Cir. 2001).  Although the individual whose property was searched bears the burden of proving a legitimate expectation of privacy in the item searched, the government has the burden of proving abandonment.

In determining whether there has been abandonment, the "critical inquiry is whether the person prejudiced by the search … voluntarily discarded, left behind, or otherwise *relinquished his interest in the property* in question so that he could no longer retain a reasonable expectation of privacy with regard to it *at the time of the search*." *Ramos*, 12 F.3d at 1022 (internal marks and citations omitted) (emphasis in original). Whether abandonment occurred is a question of intent that may be inferred by acts, words and "other objective facts." *Cofield*, 272 F.3d at 1306 (quoting *United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982)).

Because Morrow did not testify, he has not himself offered evidence to support his claim of a reasonable expectation of privacy in the bag he threw on top of the coolers in the grocery store. Instead, he attempts to meet this burden indirectly, through cross-examination of Lanier. Because Lanier testified that he saw Morrow throw the bag, Morrow implicitly argues that this is sufficient to meet his burden. But Lanier's observation may not be sufficient to satisfy Morrow's burden to establish a reasonable expectation of privacy. Morrow never testified that the bag was his, and Lanier never asked him (because he saw Morrow toss the bag).

There are several possible scenarios surrounding the bag. To provide just a few illustrations: Maybe Morrow threw it but it belonged to someone else. Maybe Morrow found it on the floor in the grocery store. Maybe Morrow was being paid to hide the bag

14

even though he did not own it. Maybe another patron saw Lanier walk in and passed off the bag to Morrow.

Who knows?

So it's unclear that Morrow has met his threshold burden. But, for purposes of this discussion, the Undersigned will assume without deciding that Lanier's testimony was adequate to meet *Morrow's* burden.

The Undersigned finds that Morrow abandoned the bag. Unlike the defendant in *Smith v. Ohio*, 494 U.S. 541, 542 (1990), Morrow did not remain standing immediately next to the property in question, where it would be *easily* retrievable. In addition, he did not, unlike that same defendant in *Smith v. Ohio,* throw the property nearby to **respond to a police officer's inquiry.** *Id.* Similarly, unlike the defendant in *Rios v. United States,* 364 U.S. 253, 262 n.6 (1960), his conduct is significantly different than a passenger who lets a package drop to the floor of the taxicab in which he is riding.

To the contrary, Morrow threw the drug-filled bag "like a hot potato" and did nothing in the store to suggest he still maintained an interest in it. *United States v. Rivera,* No. 8:14-cr-61-T-36TGW, 2014 WL 6469432, at *4 (M.D. Fla. Nov. 17, 2014) (denying suppression motion and concluding that defendant abandoned a backpack by throwing it into the trunk of a car he was no longer riding in and while walking away).

Defendants confronted with abandonment arguments often cite *Smith v. Ohio,* but the Undersigned views that case as easily distinguishable. As noted in *United States*

15

*v. Dillard,* 78 F. App'x 505, 511 (6th Cir. 2003) (affirming conviction of drugs and weapons charges and rejecting effort to invoke the *Smith v. Ohio* result), *Smith v. Ohio* involved a defendant who discarded an item "in compliance with police instructions." Specifically, after police identified themselves, the defendant tossed the bag onto the hood of his car "and turned to interact with the police, who had asked him to 'come here for a minute.'" *Id.* (quoting *Smith,* 494 U.S. at 542). No such scenario occurred here with Morrow. Morrow threw the bag on top of the freezer *before* he even had any type of encounter with Lanier. Indeed, he threw the bag away because he saw Lanier (who was wearing his police identification bag around his neck) approaching.

The fact pattern here is far closer to cases where "a person discards an item as part of an attempt to resist arrest," a situation where "courts have repeatedly found that the person abandoned the item." *Dillard,* 78 F. App'x at 511. Likewise, the circumstances here resemble a line of cases where "defendants who, immediately prior to a police encounter, throw away items containing incriminating evidence." *Id.* at 512. *See generally United States v. Park,* 142 F.3d 437 (Table) (6th Cir. 1998) (noting that defendant abandoned his interest in property when he leaned out the door of his mobile home and dropped a methamphetamine-filled thermos on the ground as police approached).

There is another fact-based reason why *Smith v. Ohio* is inapplicable. As explained in *United States v. Guadalupe,* 363 F. Supp. 2d 79, 82 (D. Conn. 2004) (quoting *State v. Smith,* 45 Ohio St. 3d 255, 263 n. 6 (1989)), in the underlying state case, the Ohio

Supreme Court noted that the defendant "was, at most, only two steps away from the bag at any time." The defendant in *Smith v. Ohio* could have easily turned around and picked up the bag, which was in plain sight on the hood.  But Morrow could not have so easily retrieved the bag he threw on top of the freezers.

Although it is surely easier to find abandonment where a defendant disclaims an interest or discards an item while fleeing from police, the absence of flight or a disclaiming statement does not mean that a defendant has not abandoned his expectation of privacy in an item of property. *See generally United States v. Witten,* 649 F. App'x 880, 885 (11th Cir. 2016) (holding that a suspect need not expressly disclaim ownership if by action the person places the items away from his person and provides a misleading statement).

Although Defendant suggests that the grocery store is not a completely public place and that Morrow might have been able to retrieve the bag himself after police left, this is speculation. Moreover, his decision to throw a bag seven feet into the air, on top of dusty shelf above a store's freezers, is "an abandonment of the tight grip of ownership and reliance solely on the feeble hope of re-acquisition." *Rivera*, 2014 WL 6469432 at *4, (quoting *United States v. Falsey*, 566 F. App'x 864, 867 (11th Cir. 2014)(internal quotation omitted)). Morrow emphasizes that the store owners are not "law enforcement friendly," but this does not mean that they would be friendly to *him* by permitting him to later enter the store and retrieve a drug-filled bag he threw atop

the freezers. *Cf. United States v. Walker*, 199 F. App'x 884, 886 (11th Cir. 2006) (noting that an inference can be drawn that a defendant did not plan to return for abandoned contraband when he knew law enforcement agents were looking for him).

Although the Undersigned concludes that Morrow abandoned the bag and therefore lacks standing to challenge the seizure and search of it, I will analyze the other issues in the event that Judge Martinez disagrees with my evaluation.

**Was the initial detention an arrest or a *Terry* stop and what evidence supports it?**

Morrow contends that Lanier's initial, brief detention was an arrest and the United States describes it as a permissible stop authorized by *Terry v. Ohio*, 392 U.S. 1 (1968) and its progeny. Before determining that issue, though, the Undersigned must first confront Morrow's argument that the United States cannot base the initial detention in the store on Paul-Noel's statement that he suspected Morrow of drug sales activity. Morrow argues that the collective knowledge/fellow officer rule permitted by *United States v. Hensley*, 469 U.S. 221, 232 (1985) is inapplicable because Lanier either never received or never heard the comment which Paul-Noel testified he made over the police radio. Morrow contends that the collective knowledge principle is unavailable when the officer who made the stop, conducted the arrest or searched the property at issue was unaware of another officer's observations or suspicions at the time of the challenged activity. In other words, Morrow contends there is less than minimal

communications when one officer did not himself personally know the information available to other officers.

The Undersigned is not convinced by this defense interpretation of the collective knowledge doctrine.

As succinctly explained in *Terrell v. Smith,* 668 F.3d 1244, 1252 (11th Cir. 2012), "both the United States Supreme Court and the Florida Supreme Court have allowed the collective knowledge of the investigating officers to be imputed to each participating officer." In *Terrell,* the Eleventh Circuit cited with approval (and quoted from) *Dewberry v. State*, 905 So. 2d 963, 967 (Fla. 5th DCA 2005), which specifically rejects Morrow's argument that Lanier had to have personally received and specifically processed Paul-Noel's on-the-radio comment about his drug-activity suspicion about Morrow's in-the-vestibule activities.  668 F.3d at 1252.

Other federal courts have also adopted this comparatively broad view of the collective knowledge doctrine in situations implicitly rejecting Morrow's view that the officer making an arrest must himself have knowledge of all the facts used to generate the requisite probable cause (or the reasonable suspicion for a *Terry* stop). *See, e.g., Charles v. Smith,* 894 F.2d 718, 724 (5th Cir. 1990) (explaining that the doctrine applies in two types of cases -- the second being a scenario where "if an arresting officer has personal knowledge of some facts that do not, standing alone, establish probable cause but, 'when added to information known by other officers involved in the investigation,

19

tips the balance in favor of the arrest,' he may make an arrest") (internal quotation omitted).

In addition, although Lanier himself may not have relied on Paul-Noel's comments about Morrow's suspected drug activity, Paul-Noel's knowledge may still be used. *Dewberry*, 905 So. 2d at 968 (noting that "there is no requirement that the officers with knowledge of the facts establishing probable cause exchange information among themselves or with other officers with 'magic words' or exact terminology" and holding that the combined information of both officers was sufficient to establish reasonable suspicion -- "regardless of the fact that the 'furtive movements' was not used by the officer who initiated the stop") (internal quotation omitted).  Therefore, when assessing the grounds for the initial detention (regardless of whether it was a *Terry* stop or an arrest), the Undersigned considers the collective knowledge available to the officers participating in the surveillance (and listening on the police radio channel).

The Supreme Court has "formulated a two-fold inquiry for examining whether an investigative stop is unreasonable under the Fourth Amendment[.]" *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006) (citing *Terry v. Ohio*, 392 U.S. at 19-20). "[I]n determining whether the seizure and search were 'unreasonable' [the] inquiry is a dual one - whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* (internal marks removed).

"There is no clear line separating arrests from *Terry* stops; the character of the seizure depends on the nature and degree of intrusion under the totality of the circumstances." *United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir. 1993). "[A]n investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a control car." *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) (internal citations omitted). "While restriction on freedom of movement is a factor to be taken into account in determining whether a person is under arrest, it alone is not sufficient to transform a *Terry* stop into a de facto arrest." *Id.* (internal citation omitted).

The Eleventh Circuit has identified four nonexclusive factors that aid in differentiating between a *Terry* stop and an arrest. *Street*, 472 F.3d at 1306 (citing *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988)). Those factors are "(1) the law enforcement purpose served by the detention; (2) the diligence with which the officers pursued the investigation; (3) the scope and intrusiveness of the investigation; and (4) the duration of the detention." *Id.* In balancing these factors, the focus is on "whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Acosta*, 363 F.3d at 1147 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)).

Based on these factors, Lanier had not detained or arrested Morrow when he walked into the store and merely saw Morrow inside. Lanier did not need any level of suspicion to walk into the store and observe Morrow standing inside. After Morrow saw Lanier, he turned, or bladed, his body in an effort to hide what he was doing. And what he was doing was to remove a bag near his waist and throw it on top of a freezer. At that point, Lanier briefly detained him by placing his hand on Morrow's shoulder and directing him to sit down. Lanier did not pull his weapon and did not handcuff Morrow. So the question is whether Lanier, armed with the collective knowledge of the officers, had reasonable suspicion to make this *Terry* stop.

Pursuant to *Terry*, law enforcement officers are permitted, under the Fourth Amendment, to "stop and briefly detain a person to investigate a reasonable suspicion that he is involved in criminal activity, even though probable cause is lacking." *United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010) (quoting *United States v. Williams*, 876 F.2d 1521, 1523 (11th Cir. 1989)). Reasonable suspicion exists where "the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate[.]" *United States v. Franklin*, 323 F.3d 1298, 1301 (11th Cir. 2003) (quoting *Terry*, 392 U.S. at 21-22). Reasonable suspicion does not require absolute proof of wrongdoing: "the requisite level of suspicion to make an investigative stop is considerably less than proof of wrongdoing

22

by a preponderance of the evidence." *United States v. Smith*, 201 F.3d 1317, 1323 (11th Cir. 2000) (internal quotations and citations omitted).

To determine whether reasonable suspicion exists in the context of a *Terry* stop, the court must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal citation omitted). The circumstances are viewed through the lens of the officer's training and experience: "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (internal quotations and citations omitted).

Likewise, when assessing an officer's conduct, the Court is also guided by the principle that "[g]reat deference is given to the judgment of trained law enforcement officers 'on the scene.'" *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003) (internal citations omitted).

The reasonable suspicion equation is also informed by yet another principle: "[a]lthough there must be some justification for the stop, none of the suspect's actions need be criminal on their face." *United States v. Knight*, 336 F. App'x 900, 902-03 (citing *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995)).

23

"In connection with a *Terry* stop, an officer may conduct a pat-down search if he has reason to believe that his own safety or the safety of others is at risk." *White*, 593 F.3d at 1202 (citing *Terry*, 392 U.S. at 27). Specifically, courts focus on "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 1202-03; *see also Adams v. Williams*, 407 U.S. 143, 146 (1972) ("The purpose of this limited search is . . . to allow the officer to pursue his investigation without fear of violence [.]").  The reasonable possibility that the individual may have a weapon is sufficient: "The officer need not be absolutely certain that the individual is armed[.]" *Terry*, 392 U.S. at 27.

As of the time Lanier conducted the *Terry* stop, police had reasonable suspicion that Morrow had engaged, or was about to engage in, criminal activity. Morrow was loitering in front of a grocery store at night in a high crime area. Moreover, he was doing more than loitering, and his conduct was significantly more concerning than merely standing in front of the store for half an hour without making any purchases. Instead, his conduct was suspicious and caused Paul-Noel to suspect drug sales activity involving hand-to-hand transactions.

Morrow suggests that his conduct was not suspicious because the neighborhood is "vibrant" and that residents are frequently out on the street talking amongst themselves. While that might be true during the day, Morrow did not elicit any evidence to suggest that this type of innocuous behavior would occur in a dimly-lit

24

vestibule in the entryway of a grocery store in the evening. Indeed, the testimony did not necessarily support the defense theory. During cross-examination, Lanier testified that neighbors in that area sometimes discuss illegal drug activity. And on redirect, Lanier testified that officers sometimes witnessed residents outside the store, being vibrant, while engaging in prostitution solicitation and drug sales.

Perhaps most significantly, Morrow tried to shield his body from Lanier and then, after turning or blading his body, he threw a bag on top of a freezer. Combined with the earlier, suspicious activity in the hallway/vestibule, this generated the necessary reasonable suspicion for a brief detention. In reaching this conclusion, I am *not* considering the exchange with the other customer who pointed to Lanier as a drug dealer because that happened after the *Terry* stop and therefore cannot be used to justify it.

## Was Lanier's search of the bag legal after he retrieved it from atop the freezer?

As noted above, the Undersigned has already determined that Morrow abandoned the bag and therefore lacks standing to challenge its search. But if I am incorrect, then the next issue to analyze is whether Lanier's search of the bag was lawful. Morrow argues that police could have, but did not, *temporarily* detain the bag until they could pursue other investigative steps, such as using a narcotics-detecting police dog to sniff the bag, or apply for a search warrant. The United States argues that

Lanier was justified in searching the bag for officer safety because he had reasonable grounds to believe it contained a weapon, drugs or both.

As expressly argued by Morrow in his post-trial memorandum, he threw the bag to a location "where he (standing 6'2" tall) **could retrieve it."** [ECF No. 24, p. 8] (emphasis added). Given this circumstance, Lanier had grounds to search the bag for officer safety even before he arrested Morrow. *United States v. Bennett*, 555 F.3d 962, (11th Cir. 2009) (holding that under-mattress search for weapons was lawful because "[a]gents may search for weapons within range of a person's 'immediate grasp' even when they are not in the process of conducting a lawful arrest, but only based on reasonable suspicion that the person poses a danger to the agent") (internal citations omitted); *United States v. Rhind*, 289 F.3d 690, 693-94 (11th Cir. 2002) (finding that officers could lawfully open and then look into zippered, soft-sided bag or backpack because they had had a reasonable articulable suspicion that the bag might contain a weapon or other contraband); *cf. United States v. Bowman*, No. 2:09-cr-182-MEF, 2010 WL 7499908, at *3 (M.D. Ala. March 4, 2010) (noting that protective search for weapons under a couch cushion in a mobile home is lawful even though the residents were handcuffed because "it is not impossible" that defendant "could have reached under the cushion for a weapon.") (internal quotations and citations omitted).

**Conclusion**

The Undersigned respectfully recommends that Judge Martinez deny the motion to suppress.

**Objections**

The parties shall have seven (7) calendar days from the date of this Report to file written objections, if any, with Judge Martinez. Each party may file a response to the other party's objection within five (5) calendar days from the date of the objection.[4] Failure to file timely objections shall bar the Parties from a de novo determination by the District Court of an issue covered in this Report and Recommendations and bar the Parties from attacking on appeal the factual findings contained herein. *Resolution Trust Corp. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993) (citing *LoConte v. Dugger*, 847 F.2d 745, 749-50 (11th Cir. 1988)).

**RESPECTFULLY RECOMMENDED** in Chambers, in Miami, Florida, on January 20, 2017.

Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

---

[4]     The Objection and Response deadlines have been shortened as this case is fully briefed and trial is set to occur on February 6, 2017.

**<u>Copies furnished to</u>:**
The Honorable Jose E. Martinez
All counsel of record